**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **RX.COM, INC.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 5:04-CV-227-DF** |
| **MEDCO HEALTH SOLUTIONS, INC.,** | § | |
| **and CAREMARK RX, INC., and** | § | |
| **EXPRESS SCRIPTS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**O R D E R**</u>

Before the Court are Defendant Caremark's Motion for Summary Judgment Dismissing All of RX.com's Claims, Plaintiff's response, and Caremark's reply.  Dkt. Nos. 263, 278 & 296, respectively.  Also before the Court are Defendant Medco's Motion for Summary Judgment on Statute of Limitations Grounds, Plaintiff's response, Medco's reply, and Defendant Express Script's Motion for Summary Judgment on Statute of Limitation Grounds, Plaintiff's response, and Express Script's reply.  Dkt. Nos. 267, 280, 295, 270, 279 & 291, respectively.  The Court held a hearing on February 6, 2008.  Dkt. No. 299.  Having considered all relevant  papers and pleadings, the Court finds that Defendants' motions (Dkt. Nos. 263, 267 & 270) should be **GRANTED**.

## I.  BACKGROUND

Plaintiff Rx.com alleges that the pharmacy benefit managers, Caremark RX, Inc. ("Caremark"), Medco Health Solutions, Inc. ("Medco"), and Express Scripts, Inc. ("Express Scripts") (collectively "Defendants") suppressed competition by "refusal to deal" and "denying

them access to their networks unless upside was shared, and otherwise acting in concert with one another" to frustrate competition.  *First Amended Complaint*, Dkt. No. 23 at ¶ 30.  Plaintiff brings claims for: (1) Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act; (2) Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act; (3) Attempted Monopolization in Violation of Section 2 of the Sherman Act; (4) Actions in Violation of Any Willing Provider Access under Texas law; (5) Actions in Violation of State Antitrust Laws; (6) Interference with Prospective Business Relations; (7) Breach of Implied at Law Contract; (8) Concert of Action; and (9) Attorneys Fees.  *First Amended Complaint,* Dkt. No. 23 at ¶¶ 49-87. At the February 6, 2008 hearing, Plaintiff admitted that the evidence does not support its claims other than the antitrust conspiracy claims.  Dkt. No. 300 at 18.  Therefore, the only remaining claims are now the antitrust claims under Section 1 and Section 2 of the Sherman Act.

Earlier in the case, Defendants filed a motion to dismiss (Dkt . No. 33) which was not considered for decision by the Court due to an administrative error.  *See* Dkt. No. 238. Defendants also filed motions for summary judgments in January 2007.  Dkt. Nos. 119, 120 & 131.  At the June 6, 2007 Hearing, Defendants proposed that the Court render a decision on the motions for summary judgment on the statute of limitations basis only, instead of deciding a motion to dismiss.  Dkt. No. 248 at 25.  At the same hearing, the Court stated that Plaintiff will have the opportunity to supplement their summary judgment response if Magistrate Judge Craven decided that additional production was necessary.  Dkt. No. 248 at 32.  On June 19, 2007, Judge Craven ordered the production of additional documents by Defendants and the Court entered an Order setting dates to complete the summary judgment briefing.  Dkt. No. 243 & 242.  The Court dismissed without prejudice the original summary judgment motions on July 11, 2007, subject to

refiling only as to the statute of limitations issues.  Dkt. No. 255.  Defendants filed their amended

summary judgment motions in August of 2007.  Dkt Nos. 263, 267 & 270.

The following are undisputed facts underlying these motions:

Rx.com received a letter from Phillip Mack, Vice President of Retail Services at

Caremark, on February 14, 2000, denying Rx.com's admission into Caremark's networks.  Dkt.

No. 264 at Ex. A ("February 14, 2000 Denial Letter").  In response, Rx.com's Vice President and

General Counsel, Chris Meakin, wrote a letter to Mr. Mack at Caremark on February 25, 2000

stating that "[p]erhaps there is some confusion between Rx.com Retail Pharmacy and Rx.com's

internet pharmacy" and requesting reconsideration of the Rx.com Retail Pharmacy.  Dkt. No. 265

at Ex. G-6 ("February 25, 2000 Response Letter").  Subsequently Cathy Steward at Rx.com and

Mr. Mack spoke on the phone and Rx.com's retail pharmacy was admitted into Caremark's

networks on March 23, 2000.  Dkt. No. 263 at 6; Dkt. No. 265 at G-7.  On February 16, 2001, an

unidentified employee at Rx.com requested a pharmacy agreement from Caremark and Caremark

sent Rx.com a pharmacy agreement on February 22, 2001.  Dkt. No. 264, Ex. B to Ex. E.  An

internal Rx.com email from Julie Branum to Cathy Steward shows that Rx.com received the

contract from Caremark on February 26, 2001 but never sent the contract back to Caremark, and

instead, told Caremark "nevermind" on February 28, 2001.  Dkt. No. 265 at Ex. G-8[1].

Meanwhile, on February 29, 2000, Mr. Meakin sent a letter to the Federal Trade Commission

("FTC") regarding "Rx.com's experience with PBMs" attaching a report analyzing the number of

requests that Rx.com had received in a six-week period to fill prescriptions for members of

---

[1] The email states: "I called and [Caremark] said someone must have requested a contract
and they just sent it out.  I had asked Barb if she requested it and she said no but she may have.  I
told Caremark never mind and re-enforced we are a retail pharmacy."

PBMs.  *Id.* at Ex. G-9 ("FTC Letter").  Also on February 29, 2000, Meakin wrote to outside

counsel, Mitchell Olejko, complaining that "Rx.com is having a tough time gaining admission

into certain PBM networks" and asking if his firm could help.  *Id.* at Ex. G-10 ("Olejko Letter").

In *Rx.com v. Hruska*, Cause No. H-04-148, an unrelated case against Cathy Steward-Hruska, Mr.

Rosson testified that "it has always been my contention that Rx.com should have been granted

access to the networks, and what the PBMs were doing was improper and wrong and illegal..."

Dkt. No. 266 at Ex. M.  In response to the question asking him when he got the "idea that the

PBMs had done something to lock Rx.com out of the marketplace," Mr. Rosson replied that

"[they] were having certainly having difficulty in the late '99 and 2000 before [he] left."  *Id.*

　　　Rx.com was first denied access to Medco's pharmacy networks on October 26, 1999

along with four other internet pharmacies.  Dkt. No. 269 at Ex. B.  In January 2000, Rx.com

contacted Medco seeking admission of their "Rx.com Retail Pharmacy" whereupon Medco

started investigating whether Rx.com had a retail pharmacy.  *Id.* at Ex. C; *Id.* at Ex. D.  On

February 1, 2000, Mr. Meakin at Rx.com sent William Strein at Medco a letter requesting

admission of their retail pharmacy, explaining that "Rx.com Retail Pharmacy is a separate stand-

alone pharmacy from Rx.com's internet pharmacy."  *Id.* at Ex. E.  Medco responded on February

15, 2000 stating that "[b]ased on our review of your pharmacy, it is apparent that Rx.com

primarily dispenses prescriptions to the general population by mail or similar means" and thus

rejecting Rx.com as a participating provider in its networks.  *Id.* at Ex. F ("February 15, 2000

Denial Letter").  Rx.com's Mr. Meakin replied on February 24, 2000, stressing that "Rx.com

Retail Pharmacy fits squarely within [Medco's] retail community based pharmacy requirement"

and stating that "if [Medco] continues to exclude Rx.com Retail Pharmacy, we will take direct

legal action to end this discrimination." *Id.* at Ex. G ("February 24, 2000 Response Letter").

Subsequent to receiving this letter from Rx.com, Medco visited Rx.com's retail location. *Id.* at

Ex. J.  On April 27, 2000, Medco's William Strein sent a letter to Mr. Meakin at Rx.com stating

that based on the additional information provided and the information learned from the visit, "it

is apparent that Rx.com Retail Pharmacy does not meet [Medco's] retail community-based

pharmacy requirements and therefore, [Medco] will not include Rx.com Retail Pharmacy as a

participating provider in [Medco's] retail networks. *Id.* at Ex. K ("April 27, 2000 Denial

Letter").  On September 7, 2000, Julie Branum of Rx.com sent a letter to Medco to request

admission in Medco's network "so that [Rx.com] [is] able to fill prescriptions for [its] own

employees." *Id.* at Ex. L.  In response, Medco wrote to Rx.com's health insurance provider,

United Healthcare, on September 18, 2000, stating that "Rx.com does not meet our requirements

as a retail pharmacy and their mail service is not in any [Medco] network because we are the

exclusively contracted mail service provider for our plan sponsors (clients)." *Id.* at Ex. N.

United Healthcare supported this decision stating that Rx.com is "primarily a .com company"

and "UHC considers .com pharmacies to be mail order in drag and therefore we do not allow

them into the network." *Id.* at Ex. O.

Plaintiff has alleged and Express Scripts has accepted as true for the purpose of this

motion, that Express Scripts perfunctorily denied Rx.com's request for admission to its pharmacy

networks in February 2000. *Complaint*, Dkt. No. 1 at ¶ 40; *First Amended Complaint*, Dkt. No.

23 at ¶ 43; Dkt. No. 270 at 2 & fn. 1.  Rx.com had several discussions with Express Scripts from

June 2000 to April 2001 mainly regarding "opportunities for collaborations."  Dkt. No. 291 at

Ex. B-G; Dkt. No. 284 Ex. 85, 87 & 88.  On April 19, 2001, Bruce Anderson at Rx.com

requested a network agreement from Beth Wingate at Express Scripts "so [Rx.com] can provide prescriptions to the employees of CBS/Viacom."  Dkt. No. 284 at Ex. 87 ("April 19, 2001 Letter").  Also in the same letter, Mr. Anderson stated that there were rumors that other online competitors of Rx.com were participating with Express Scripts and inquired as to "why they can fill for your participants, but we can't."  *Id.*  After investigating the three online pharmacies that were rumored to be participating in Express Scripts' networks, Express Scripts replied to Rx.com as follows: "I have confirmed that 2 of the [three online pharmacies] are definitely not in any of our networks, the 3rd may have gotten in via a chain.  We are still investigating."  *Id.* at Ex. 88.

## II. PARTIES' POSITIONS

Defendant Caremark moves for summary judgment based on the lapse of the statute of limitations.  Dkt. No. 263.  Caremark argues that Rx.com's antitrust claims are time-barred since February 2000 was when the cause of action accrued—Caremark bases this contention mainly on Caremark's February 14, 2000 Denial Letter (and denials from Medco and ESI at about the same time); Rx.com's February 25, 2000 Response Letter to Caremark indicating Rx.com's understanding that Rx.com was denied admission because it was an internet pharmacy; the Olejko Letter expressing the difficulty Rx.com was having in gaining admission to certain Pharmacy Benefit Manager ("PBM") networks; and the FTC Letter complaining of Rx.com's experience with PBMs dated February 29, 2000.  *Id.* at 9-11.  Caremark claims that Plaintiff's complaint, Rx.com's records, Mr. Rosson's testimony, along with the other evidence show that it knew of the facts on which it based its October 2004 claims in February 2000.  *Id.* at 12-15.  Similarly, Defendant Medco argues Plaintiff's claims are barred since the statute of limitations accrued in April 2000 at the latest—Medco argues that the February 24, 2000 Response Letter

from Rx.com to Medco threatening legal action, along with the FTC Letter and Olejko Letter makes it likely that Rx.com's claims accrued in February 2000 but any doubt that the claims accrued are resolved by Medco's April 27, 2000 Denial Letter.  Dkt. No. 267 at 3-10.  Express Scripts also claims the limitations have lapsed since their rejection of Rx.com's request in February 2000, the Olejko Letter, the FTC Letter, Rx.com's February 24, 2000 Response Letter to Medco, and Mr. Rosson's testimony demonstrate that Rx.com was aware of its claims against Defendants as of February 2000.  Dkt. No. 270 at 5-11.  Defendants also argue that the "fraudulent concealment," "continuing violation" and "speculative damages" exception to the statute of limitations are inapplicable.  Dkt. No.263 at 15-21; Dkt. No. 267 at 11-20; Dkt. No. 270 at 11-15.  Medco and Express Scripts further submit that the receivership does not warrant equitable tolling.  Dkt. No. 267 at 20-21; Dkt. No. 270 at 12-15.

Plaintiff responds that the statute of limitations does not operate to bar its antitrust claims since the events in February 2000 point to unilateral action and not collusive conduct.  Dkt. No. 278 at 6; Dkt. No. 280 at 6; Dkt. No. 270 at 6.  As to Caremark, Plaintiff claims that the February 14, 2000 letter was not a "final" rejection by Caremark since the language was open to re-examination at a later date and Plaintiff made other submissions after October 2000.  Dkt. No. 278 at 6-12.  As to Medco, Plaintiff claims that the February 15, 2000 letter was not "final" since it continued to seek admission through 2001.  Dkt. No. 280 at 6-11.  As to Express Scripts, Plaintiff claims that the denial was not final in February 2000 since Plaintiff continued to submit customer sales to Express Scripts for insurance adjudication after October 2000 and Express Script had discussions with Plaintiff in early 2001 which included sending a pharmacy network application.  Dkt. No. 279 at 6-12.  Plaintiff also claims that Plaintiff's knowledge of unilateral

denials from the Defendants or correspondence with the FTC, Mr. Olejko or Caremark and

Medco regarding the same does not signify its awareness of collusive conduct.  Dkt. No. 278 at

12-15; Dkt. No. 280 at 11-15; Dkt. No. 279 at 13-16.  Similarly, Plaintiff argues that Mr.

Rosson's testimony in *Rx.com v. Hruska* does not support knowledge of collusive conduct in

2000.  Dkt. No. 278 at 15-16; Dkt. No. 280 at 15-16; Dkt. No. 279 at 16-17.  Plaintiff argues that

its continued efforts seeking Defendants' approval give rise to "continuing violations" of the

antitrust laws to revive the statute of limitations.  Dkt. No. 278 at 17-18; Dkt. No. 280 at 16-17;

Dkt. No. 279 at 17-19.  Plaintiff also argues that the statute of limitations are tolled since plaintiff

could not have discovered grounds for a conspiracy through the exercise of reasonable diligence.

Dkt. No. 278 at 20-21; Dkt. No. 280 at 19-20; Dkt. No. 279 at 21-22.  Plaintiff further submits

that defendant's fraudulent concealment tolls the statute of limitations since the secret

communications and secret meetings between Defendants were only revealed in the discovery of

nonpublic documents in 2007 and the Defendants affirmatively concealed the conspiracy.  Dkt.

No. 278 at 22-39; Dkt. No. 280 at 21-38; Dkt. No. 279 at 22-39.  Plaintiff lastly argues that

equitable tolling applies to preserve Plaintiff's claims since Rx.com lacked the person to

investigate and bring any antitrust claims until April 2004—all board members and officers

resigned in May 2001 and the receiver appointed from December 2001 to April 2004 did not

have the authority to pursue antitrust claims.  Dkt. No. 278 at 40-42; Dkt. No. 280 at 39-41; Dkt.

No. 279 at 39-42.

Caremark and Express Script reply that Plaintiff fails to identify a date after February

2000 but before October 2004 on which it became aware of facts that made it initiate this

litigation.  Dkt. No. 296 at 3; Dkt. No. 291 at 1-3.  Medco reiterates that it refused to admit

Rx.com into its network three times by April 2000.  Dkt. No. 295 at 1.  Caremark and Medco submit that the proper standard for the accrual of Rx.com's claims is the discovery of the injury, not discovery of the collusion.  Dkt. No. 296 at 5; Dkt. No. 295 at10-13.  Caremark and Medco argue that the "continuing conspiracy" exception does not apply since the rejection was final prior to October 2000 and Plaintiff fails to show an overt act by Caremark or Medco within the limitations period.  Dkt. No. 296 at 8-9; Dkt. No. 295 at 4-10; Dkt. No. 291 at 7-10.  As to "fraudulent concealment," Caremark points out that Plaintiff fails to prove diligence required to satisfy the exception.  Dkt. No. 296 at 12.  Medco and Express Script argue that the doctrine does not toll the limitations since Plaintiff has failed to show that Medco engaged in "affirmative acts" of concealment and since Plaintiff knew of the facts that formed the basis of its claims by early 2000.  Dkt. No. 295 at 13-19; Dkt. No. 291 at 10-14.  Defendants finally argue that equitable tolling does not apply in this case since receivership does not toll limitations under Texas law. Dkt. No. 296 at 18; Dkt. No. 295 at 19-20; Dkt. No. 291 at 14-15.

## II.  LEGAL PRINCIPLES

In a motion for summary judgment, the moving party has the initial burden of showing that there is no genuine issue of any material fact and that judgment should be entered as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  An issue is "material" where it involves a fact that might affect the outcome of the suit under the governing law of the underlying cause of action.  *See Burgos v. S.W. Bell Tel. Co.,* 20 F.3d 633, 635 (5th Cir. 1994) (citing *Anderson,* 477 U.S. at 248)).  The nonmovant is not required to respond to a motion for

summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial.  *Ashe v. Corley,* 992 F.2d 540 (5th Cir. 1993).  Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

## III.  DISCUSSION

### (1) Accrual of the Statute of Limitations

The United States Code provides that "any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the action accrued." 15 U.S.C. § 15b (2006); Tex. Bus. & Comm. Code Ann. § 15.25(a) (2006).  "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  *Zenith Radio Corp. v. Hazeltine Research*, *Inc.*, 401 U.S. 321, 338 (1971).  "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date..."  *Id.* at 339.

Plaintiff's argument that their antitrust claims did not accrue until they had knowledge of collusion as opposed to unilateral conduct seems to be based on an incorrect understanding of the law.  The Supreme Court has recognized the "injury focused accrual rule" in the antitrust context.  *See Rotella v. Wood*, 528 U.S. 549, 557 (2000) (recognizing that "Clayton Act's injury focused accrual rule" was well established by the time civil RICO was enacted); *Klehr v. A.O. Smith*

*Corp.*, 521 U.S. 179, 198 (1997) (stating that a "pure injury accrual rule" does not apply to a civil

RICO case the same way it applies to antitrust cases).  Thus, in refusal to deal cases such as this,

the statute of limitations begins to run when the plaintiff discovers the injury, not the elements of

the claim.  *See Rotella v. Wood*, 528 U.S. at 557 (stating that the accrual rule requiring discovery

of the injury and the pattern of racketeering in a civil RICO claim "would clash with the

limitations imposed on Clayton Act suits"); *Id.* at 555 ("Federal courts ... generally apply a

discovery accrual rule when a statute is silent on the issue ... But in applying a discovery accrual

rule, we have been at pains to explain that discovery of the injury, not discovery of the other

elements of a claim, is what starts the clock."); *See also In re Copper Antitrust Litigation*, 436

F.3d 782, 789 (4th Cir. 2006) ("accrual occurs when the plaintiff discovers that he has been

injured and who caused the injury.")

Rx.com received Caremark's denial on February 14, 2000, Medco's denial on October

26, 1999, and Express Script's denial in February 2000.  Medco's February 15, 2000 Denial

Letter makes clear that Rx.com was being denied admission based on Medco's determination

that Rx.com was primarily a mail-order pharmacy.  Rx.com's letter to Caremark and Medco on

February 24th and 25th of 2000 confirms Rx.com's understanding that Caremark and Medco

were excluding Rx.com's internet pharmacy from its networks.  The letters to FTC and Mr.

Olejko on February 29, 2000 are further evidence that Rx.com understood that they were being

excluded admission into the Defendants' networks.  Plaintiff was aware of its injury (exclusion

from the industry) as of February 2000, when its applications were denied.  Indeed, it felt the

"adverse impact of an antitrust conspiracy" in February 2000 of which it complained in its letters

to the FTC and their outside counsel.  *See Zenith Radio Corp. v. Hazeltine Research*, Inc., 401

U.S. at 339.  It is irrelevant that Plaintiff may have been unaware of the exact scope or scale of

the alleged conspiracy.  *See Texas v. Allan Construction Co., Inc.*, 851 F.2d 1526, 1533 (5th Cir.

1988) *citing Prather v. Neva Paperbacks*, Inc. 446 F.2d 338 (5th Cir. 1971) ("the statute of

limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their

potential claim"); *See also GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir.

2007) ("Where a plaintiff knows of a pattern of particular actions that a defendant has taken

against him, though the pattern's precise scope might be unclear and its exact legal ramifications

uncertain, the plaintiff is on inquiry notice of his claim.")[2].  The FTC letter stating that "2/3 of

[Rx.com's] requests from [Rx.com's] prospective customers have to be turned away because

*certain* PBM's refuse to allow Rx.com into their networks" and attaching a list of PBMs

including Defendants shows that Plaintiff knew of the players involved in causing its injury

(emphasis added).  *See In re Copper Antitrust Litigation*, 436 F.3d 782, 789 (4th Cir. 2006)

("accrual occurs when the plaintiff discovers that he has been injured and who caused the

injury.").  Rx.com's CEO, Mr. Rosson's testimony in 2006 in an unrelated case admitting that he

felt that they were being excluded from the networks[3] and internal communications attaching

---

[2]Although these cases deal with the duty to inquire in the context of fraudulent concealment, these statements are equally applicable in determining the point when the injury was discovered.

[3] In response to the question asking whether he felt "that the PBMs were doing something that was preventing Rx.com from joining up with those networks" in the late '99 and early 2000 time frame, he answered "[i]n my capacity as the president and the officer of the corporation [and based on the knowledge of other people that Rx.com relied on]... yes, we were being denied access to the networks."  Rosson's Deposition Testimony dated May 24, 2006 in *Rx.com v. Hruska*, Case No. H-04-148 (S.D. Tex. Nov. 13, 2006), Dkt. No. 266 at Ex. M.

articles relating to Defendants refusal to deal with online pharmacies in late 1999 to early 2000[4]

further corroborates that Rx.com discovered its injury in early 2000.

Thus, the Court finds that in the absence of the exceptions discussed below, Plaintiff's

claims accrued by no later than February 2000.  A continuing conspiracy, fraudulent concealment

or speculative damages could all toll the accrual of the statute of limitations.  Additionally, the

limitations may also be equitably tolled in certain circumstances.

(2) Continuing Violation

Under the continuing conspiracy theory, "each time a plaintiff is injured by an act of the

defendants a cause of action accrues to him to recover the damages caused by that act and ... the

statute of limitations runs from the commission of the act."  *Zenith Radio Corp. v. Hazeltine*

*Research*, Inc., 401 U.S. at 338  ("[I]f a plaintiff feels the adverse impact of an antitrust

conspiracy on a particular date, a cause of action immediately accrues to him to recover all

damages incurred by that date...); *See also Poster Exchange v. Nat'l Screen Service Corp.*, 517

F.2d 117, 124-25 (5th Cir. 1975); *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale*

*Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982).

Defendants initially argue that the statute of limitations accrue on the "date ... which the

---

[4]In an internal Rx.com email dated April 3, 2000 Rachel Lee forwarded an article entitled "The Internet's Drug Lords" discussing the PBMs refusal to deal with online drugstores.  Dkt. No. 268 at Ex. H.  An earlier email dated August 3, 1999 sent from Rx.com's marketing department to other Rx.com employees, the article titled "Online drug stores' mixed promise" discusses how none of the major online drug stores are able to fill certain prescriptions because of the PBMs.  Dkt. No. 268 at Ex. I.  Rx.com was also in possession of  a newspaper article discussing how "[m]any PBMs exclude online pharmacies from their networks." Dkt. No. 265 at G-1.  This article includes an interview of Mr. Rosson, Rx.com's CEO, where he states that he "hopes that health plans and employers adopting his proposal will pressure PBMs to open up their pharmacy networks."  "New Pricing for Online Drugs Proposed", February 21, 2000, American Association.

defendant's alleged exclusion initially occurred" in a conspiracy to refuse to deal claim.  Dkt. No.

263 at 10 *citing Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.*, 295 F.2d 362 (5th

Cir. 1961), *aff'ing Norman Tobacco & Candy Co. v. Gillette Safety Razor Co.*, 197 F. Supp. 222,

335-36 (N.D. Ala. 1960); Dkt. No. 270 at 9.  However, the dictum in *Norman Tobacco* was

overruled in *Poster Exchange* after *Zenith* upheld the continuing conspiracy theory.  *Poster*

*Exchange v. Nat'l Screen Service Corp.*, 517 F.2d at 125 ("We are persuaded that after *Zenith*

and *Hanover Shoe*, the *Norman Tobacco* dictum cannot be understood to control ... (W)hatever

expressions we have used from time to time, which might suggest that in antitrust situations there

is no such thing as a continuing conspiracy, now must yield their sweeping force."); *See also Bell*

*v. Dow Chemical Co.*, 847 F.2d 1179, 1186-87 (5th Cir. 1988) (refusing to apply the Ninth

Circuit rule where limitations on refusals to deal begin to run from the date of the first alleged

refusal).  Thus, "[t]he initial express refusal to deal [may constitute] no more than a refusal to

deal at the time." *Id.* at 126.  That is unless "the violation is final at its impact ... or ... [a] wrong

is ... permanent at initiation without further acts..." *Id.*

　　　　To toll the statute of limitations, the plaintiff must show "some act of the defendants

during the limitations period [that injured plaintiff's business.]" *Poster Exchange v. Nat'l Screen*

*Service Corp.*, 517 F.2d  at 128-29 (Where plaintiff complained that defendant excluded it from

participation in the standard accessory industry, the 5th Circuit held that plaintiff failed to

demonstrate that it had been refused access to standard accessories within the limitation period,

and remanded to the district court to determine "whether there was ... a mere absence of dealing

or whether there was some specific act or word precluding [plaintiff] from obtaining supplies.");

*See also Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d at 1051

("a cause of action accrue[s] whenever the defendant commits an overt act in furtherance of an antitrust conspiracy."); *Bell v. Dow Chemical Co.*, 847 F.2d at 1187; *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 572 (4th Cir. 1976) ("[E]ven when the plaintiff charges a continual refusal to deal, the statute of limitations commences to run from the last overt act causing injury to the plaintiff's business.").

"[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exchange v. National Screen Service Corp.*, 517 F.2d at 127-28; *See also Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d at 1055 ("the harm that creates the new cause of action must be antitrust harm, i.e., a continuing injury to competition, not mere a continuing pecuniary injury to plaintiff"). In *Braun v. Berenson,* the Fifth Circuit distinguished between a new refusal to deal and a reiteration of a previous refusal. *Braun v. Berenson*, 432 F.2d 538, 542-43 (5th Cir. 1970). The Court explained that limitations were not tolled in cases where a supplier refused to sell its product to a distributor at some time outside the statutory period and then failed to react to initiatives from the terminated distributor to resume a course of dealing, since this was merely "a reiteration of a previous refusal." *Id.* at 543. However, the Court held, separate causes of action accrue when there is a "new overt act giving rise to new and independent damages." *Id.*

Plaintiff argues that Caremark's February 14, 2000 Denial Letter was not a "final" denial since the language of the letter indicated that Caremark was open to reconsideration. *See* Dkt.

No. 278 at 10-11; Dkt. No. 264, Ex. A[5].  However, any doubt as to whether the decision not to

admit Plaintiff's internet pharmacy was final is resolved with the February 25, 2000 letter from

Rx.com's general counsel, Christoper Meakin  to Caremark's vice president, Phillip Mack, which

shows Mr. Meakin's understanding that Caremark was not admitting internet pharmacies into its

network.  Dkt. No. 265, Ex.G-6[6].  Plaintiff also points out that Caremark sent a network

application package to Rx.com in February of 2001 in response to Rx.com's request earlier that

month.  *See* Dkt. No. 278 at 10; Dkt. No. 264, Ex. B to Ex. A.  This evidence is similarly

unpersuasive in disproving the finality of the February 2000 denial especially in view of

Caremark's policy of sending out applications to any pharmacy that requested one without prior

review and Rx.com's phone call to Caremark saying "nevermind."  *See* Dkt. No. 264 at Ex. D[7];

Dkt. No. 265, Ex. G-8 .

As to Medco, the Court finds that Medco's October 26, 1999 rejection of Rx.com and

other internet pharmacies together with Medco's February 15, 2000 Denial Letter to Rx.com

explaining that the Rx.com Retail Phamarcy is not admitted to their retail network because

Rx.com is primarily a mail order pharmacy shows that Medco's denial was final as early as

---

[5]The letter provides as follows: "[Y]our pharmacy does not meet the criteria for participation in our network.  Should our criteria change we will notify your pharmacy.  Until such time, we will hold your application on file."  Dkt. No. 264, Ex. A.

[6]Meakin states his concern that "[p]erhaps there is some confusion between Rx.com Retail Pharmacy and Rx.com's internet pharmacy" and urges Caremark to reconsider Rx.com Retail Pharmacy's inclusion into Caremark's Retail Pharmacy Network.  Dkt. No. 265, Ex. G-6.

[7]"The standard practice in my organization at the time was to send a contract to any pharmacy that requested one.  Once a completed contract was returned by a pharmacy, it was reviewed to determine whether the pharmacy was eligible to participate in Caremark's networks."  Mack Decl. P 5, Dkt. No. 264 at Ex. D.

October 1999 and by no later than February 2000.  *See* Dkt. No. 269 at Ex. B; *Id.* at Ex. F.

Medco's April 27, 2000 Denial Letter to Rx.com after their visit to Rx.com's retail location

refusing to admit Rx.com Retail Pharmacy in Medco's retail networks because Rx.com's

location did not have the attributes of a retail pharmacy location confirms Medco's intention not

to accept internet pharmacies into their networks.  *Id.* at Ex. K.  In addition, Rx.com's February

1, 2000 Letter to Medco requesting admission of the Rx.com Retail Pharmacy and Rx.com's

February 24, 2000 Response Letter to Medco explaining that Rx.com Retail and not Rx.com is

applying for entry into Medco's network shows that Rx.com understood that Medco would not

be admitting their internet pharmacy.  *Id.* at Ex. E; *Id.* at Ex. G.  Medco's response to Rx.com's

request in September 2000 for admission to Medco's network for the limited purpose of filling

prescriptions for Rx.com's employees is further evidence that the denial in February of 2000 was

a firm refusal to deal and not just a "refusal to deal at the time."  *See Id.* at Ex. N[8]; *See Poster*

*Exchange v. National Screen Service Corp.*, 517 F.2d at 126.  Similarly, as to Express Scripts,

the Court finds no evidence to indicate that the alleged February 2000 denial did not reflect a

final decision to exclude Rx.com from Express Script's networks.  *See* Dkt. No. 270 at 5; *Id.* at

11-12.

Defendants' denial in February of 2000 was not followed by any subsequent refusals or

other overt acts by the Defendants which would have tolled the limitations.  Although Plaintiff

states that there were subsequent submissions to all three Defendants for claim adjudication

---

[8]In reaction to Rx.com's September 2000 request, Medco wrote to United Healthcare
stating that "the pharmacy called 'Rx.com' does not meet our requirements as a retail pharmacy
(as Rx.com Retail Pharmacy) and their mail service (Rx.com) is not in any PAID network
because we are the exclusively contracted mail service provider for our plan sponsors (clients)."
Dkt. No. 269 at Ex. N.

which were denied, the evidence cited by Plaintiff only relates to Express Scripts.  Dkt. No. 284 at Ex. 81; See also Dkt. No. 278 at 6; Dkt. No. 280 at 6; Dkt. No. 279 at 6.  Although, as Defendants point out, similar evidence exists as to Caremark as well, these documents do not evidence any communication between Rx.com and Express Scripts or Caremark.  *See* Dkt. No. 284 at Ex. 80; *Id.* at Ex. 81.  These documents merely show that Rx.com declined to fill prescriptions for customers with insurance policies covered by the Defendants.  See Dkt. No. 291 at 7.  As Express Scripts argues, this is merely the "abatable but unabated inertial consequences of some pre-limitations action."  *See Poster Exchange v. National Screen Service Corp.*, 517 F.2d at 127-28; *See also Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d at 1055 ("the harm that creates the new cause of action must be antitrust harm, i.e., a continuing injury to competition, not mere a continuing pecuniary injury to plaintiff").  The Fifth Circuit has repeatedly noted that limitations are not tolled for "fail[ure] ... to resume a course of dealing" or a "mere absence of dealing."  *Braun v. Berenson*, 432 F.2d at 542-43 *discussing Garlick v. Goerlich's, Inc.*, 323 F.2d 854 (6th Cir. 1963) and *Sherman v. Goerlich's, Inc.*, 238 F.Supp. 728 (E.D. Mich. 1963) (limitations not tolled when supplier failed to react to initiatives from the terminated distributor to resume a course of dealing); *See also Poster Exchange v. Nat'l Screen Service Corp.*, 517 F.2d  at 129 (limitations does not toll when there is a "mere absence of dealing" as opposed to "specific act or word of refusal.").

Likewise, it seems Rx.com's discussions with Express Scripts that continued from around June 2000 through April of 2001 was mainly to collaborate regarding the possibility of a European Joint Venture or the use of Rx.com's facilities to outsource Express Script's prescription fulfillment.  *See* Dkt. No. 291 at 8; Dkt. No. 291 at Ex. B-G.  As Express Scripts

argues, during this time, Express Script made it clear that it had no intention of reconsidering its

decision not to admit Rx.com into its networks.  *See* Dkt. No. 291, Ex. D at 1-2 ("it wants to use

only one brand on the net–Express Scripts."); *Id.* at 2 ("He made it clear that ESI would not

outsource any significant part of its internet fulfillment business and wants to use its own brand

name.").  Although Plaintiff argues that Express Script's transmittal of its network agreement to

Rx.com in April 2001 shows that there was no irrevocable denial prior to the limitations period,

Rx.com only requested the application for the limited purpose of "provid[ing] prescriptions to the

employees of CVS/Viacom."  *See* Dkt. No. 279 at 6; Dkt. No. 284 at Ex. 87.

The inquiry and response regarding rumors that other online competitors of Rx.com were

participating with Express Scripts similarly shows no indication on the part of Express Scirpts

that would constitute a "new overt act giving rise to new and independent damages."  *See* Dkt.

No. 284 at 87 & 88; *See Braun v. Berenson*, 432 F.2d at 542.  To the extent that this evidence

shows continuing efforts of Rx.com to gain admission into Express Scripts' networks, repeated

requests to which there is barely a reiteration of a previous refusal is insufficient to toll

limitations[9].  *See* AREEDA, HOVENKAMP & BLAIR, ANTITRUST LAW 320 at 214 (2d. ed. 2000)

("Plaintiffs are not generally allowed to restart the limitations period perpetually merely by

repeated requests that the defendant refuses"); *See also Braun v. Berenson*, 432 F.2d at 542.

Plaintiff also argues that Caremark's internal presentation in 1999 and Caremark's

presentation to one of its clients, Krafts Foods, in May 2000 "contradicts the notion that

---

[9]To the extent that Plaintiff's request to Medco in September 2000 for a limited purpose admission, discussed above, can be regarded as continuing efforts to gain admission into Medco's networks, this is also insufficient to toll limitations.  There is no evidence that Medco even responded to Plaintiff—instead, Medco wrote to United Healthcare and reiterated their position that Rx.com would not be accepted into their networks.  *See* Dkt. No. 269 at Ex. N.

Caremark's February letter to Rx.com was irrevocable." *See* Dkt. No. 278 at 11.  Caremark's internal presentation provides that "[a]t a future date TBD, consider allowing Internet pharmacies in <u>on an exception basis</u> only." (emphasis in original).  Dkt. No. 283 at Ex. 41.  Caremark's May 2000 presentation to Krafts Foods lists Rx.com as one of the companies with which Caremark was having partnership discussions.  Dkt. No. 283 at Ex. 67.  However, these documents were in no way drafted for or provided to Plaintiff and are thus irrelevant in proving Caremark's intent towards Plaintiff.  Furthermore, Caremark's 1999 presentation shows that Caremark was not admitting internet pharmacies into their network, and was only considering allowing internet pharmacies "on an exception basis" at some future date.  To the extent that these documents may indicate that Caremark's refusal in February 2000 was not final, the "no dotcom" policies refute that notion. Dkt. No. 264, Ex. D at  ¶¶ 5-6.

Finally, Plaintiff argues that the affidavit testimony of Dr. Shustari and Mr. Rosson that confirms "that there was a corporate goal continuing efforts by Rx.com to gain access to major PBM networks" through at least March 2001 undercuts the notion of finality.  Dkt. No. 278 at 17-18; *See also* Shustari Decl., Dkt. No. 286; Rosson Decl. at ¶ 5, Dkt. No. 285.  Although Dr. Shustari as former Executive Vice President and Chief Medical Officer of Rx.com, and Mr. Rosson as former and current Chief Executive Officer of Rx.com, may very well be qualified to represent the knowledge of Rx.com at the time, as discussed above, Rx.com's continuing efforts to seek admission into Defendants' networks are insufficient to toll the limitations.  *See Braun v. Berenson*, 432 F.2d at 542; *See* AREEDA, HOVENKAMP & BLAIR, ANTITRUST LAW 320 at 214, *supra*.

<u>(3) Fraudulent Concealment</u>

The Plaintiff must prove two elements to invoke the fraudulent concealment doctrine: "first, that the defendants concealed the conduct complained of, and second, that the plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *Texas v. Allan Construction Co.*, 851 F.2d at 1528 *citing In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1169 (5th cir. 1979).  The Court addresses the second element first.

(a) plaintiff's knowledge of their cause of action

Under the fraudulent concealment doctrine, the statute of limitations is tolled only until plaintiff discovers or should have discovered facts that form the basis of his claim.  *Texas v. Allan Construction Co.*, 851 F.2d at 1533; *Battle v. Liberty Nat. Life Ins. Co.*, 493 F.2d 39, 52 (5th cir. 1974) ("when the defendant fraudulently conceals an antitrust violation, the period of limitations does not begin to run until the violation is discovered or should have been discovered.").  In the present case, the Court has found that the Plaintiff was aware of its injury as of February 2000 at the latest.  Given that Plaintiff hardly provides any information that it acquired after February 2000 but before it filed the Complaint in October 2004[10], it seems likely that it also discovered the facts forming the basis for its claim in February 2000.

However, even assuming that Plaintiff has alleged facts after February 2000 that became the basis of its claims that it was not aware of as of February 2000, Plaintiff is also charged with constructive knowledge.  Once the Plaintiff "learn[s] of facts 'calculated to excite inquiry,'" it has a duty to inquire.  *In re Beef Industry Antitrust Litigation*, 600 F.2d at 1171.  Rx.com had a

---

[10] Although Plaintiff does note that "[Defendants'] success in killing off an entire class of internet mail pharmacies only occurred after 2000," this information by itself does not show an injury or basis for antitrust claims that were not discovered in early 2000.  *See* Dkt. No. 278 at 35.

duty to inquire once it received denials from all three defendants at around the same time in

February of 2000. *See GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d at 179 ("Where a

plaintiff knows of a pattern of particular actions that a defendant has taken against him, though

the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the

plaintiff is on inquiry notice of his claim."). This is especially the case since Rx.com was (or

should have been) aware of the newspaper articles[11] stating that PBMs were refusing to deal with

online pharmacies and in view of Mr. Rosson's testimony that he felt "that the PBMs were doing

something that was preventing Rx.com from joining up with those networks" in the late '99,

early 2000 time frame. Dkt. No. 266 at Ex. M; *See GO Computer, Inc. v. Microsoft Corp.*, 508

F.3d at 179 ("What put [plaintiff] so plainly on inquiry is the multiplicity and specificity of the

information he had."). In fact, as Express Scripts argues, Rx.com did inquire as seen by the FTC

Letter and Olejko Letter.

      However, "even though a plaintiff might have inquiry notice of a potential claim, it does

not necessarily follow that reasonable diligence will discover sufficient facts to support legal

action." *Texas v. Allan Construction Co.*, 851 F.2d at 1533. Defendants have the burden to

demonstrate that "plaintiffs, through the exercise of reasonable diligence, would have discovered

adequate ground for filing suit." *In re Beef Industry Antitrust Litigation*, 600 F.2d at 1171; *Texas

v. Allan Construction Co.*, 851 F.2d at 1533. In the present case, it is questionable whether due

diligence would have led to the discovery of the full scope and extent of the alleged conspiracy

since much of the information which Plaintiff asserts as evidence of a conspiracy was non-public

information which was only disclosed after the action was brought. Moreover, the newspaper

---

[11]*See* fn. 3, *supra*.

articles discussed above in fn. 4 provide some ambiguity as to what the major PBMs were doing and whether there would be a change. *See* Dkt. No. 265, Ex. G-1 at 6[12]; Dkt. No. 268, Ex. H at 3[13]; Dkt. No. 268 at Ex. J.  However, as the 4th Circuit noted, "[f]ull knowledge often awaits discovery." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d at 178.  The Court finds that just as the Plaintiff filed this action in October 2004 without the benefit of this information, the Plaintiff had enough information in early 2000, that with reasonable diligence, it would have discovered adequate grounds for filing suit.

Even though Plaintiff's actual or constructive knowledge of their cause of action prior to the limitations period alone is sufficient to preclude the application of the fraudulent concealment doctrine, the Court proceeds to consider whether there was fraudulent concealment on the part of the Defendants.

(b) acts of concealment

To satisfy the first element, the defendants must have engaged in "affirmative acts of concealment." *Texas v. Allan Construction Co.*, 851 F.2d at 1528-29.  However, the acts that demonstrate concealment need not be separate from the acts in furtherance of the conspiracy. *See Id.* at 1529.  In the present case, Plaintiff argues that the secret communications between the Defendants while they each claimed they were making unilateral decisions and publicly stated they were horizontal competitors constitute fraudulent concealment.  *See* Dkt. No. 278 at 26;

---

[12]This article includes an interview of Mr. Rosson, where he states that he "hopes that health plans and employers adopting his proposal will pressure PBMs to open up their pharmacy networks."

[13]"After first refusing to deal with online drugstores altogether, however, the nation's three largest PBMs recently softened their stance."

Dkt. No. 280 at 25; Dkt. No. 279 at 26.  Had Defendants performed affirmative acts to conceal

their alleged collusion to exclude Rx.com from their networks in furtherance of their alleged

conspiracy, this would have been sufficient to establish concealment for the purposes of this

doctrine.

However, "[c]oncealment by defendant only by silence is not enough.  He must be guilty

of some trick or contrivance tending to exclude suspicion and prevent inquiry." *Texas v. Allan*

*Construction Co.*, 851 F.2d at 1532 *quoting Crummer Co. v. Du Pont*, 255 F.2d 425, 432 (5th

Cir. 1958).  Similarly, "denial of wrongdoing is no more an act of concealment than is silence"

unless "the parties are in a fiduciary relationship, or where the circumstances indicate that it was

reasonable for the plaintiff to rely on defendant's denial." *Texas v. Allan Construction Co.*, 851

F.2d at 1532-33.  In *Texas v. Allan Construction Co.*, where the State brought action against

highway contractors for conspiracy to rig construction bids with evidence that defendant

conducted covert meetings, submitted affidavits that falsely denied any collusion, and submitted

intentionally high complementary bids to make other inflated bids appear legitimate, the Fifth

Circuit remanded to the district court to determine whether the State's reliance on the affidavits

was reasonable. *Id.* at 1533.

Here, there is no such affirmative act of concealment on the part of the Defendants.

Although Plaintiff argues that Caremark's denial letter in February 2000 was deliberately vague

to "camouflage their intent," this is merely "silence" or at best, a "denial of wrongdoing"[14] which

---

[14] Even if Caremark's February 14, 2000 Letter can be perceived as a "denial of
wrongdoing," this is not an "act of concealment" since Rx.com and Caremark were not in a
fiduciary relationship, and Rx.com had no other reason to rely on Caremark's letter. *See Texas v.*
*Allan Construction Co.*, 851 F.2d at 1532.

does not constitute an "act of concealment" for the purpose of this doctrine.  *See* Dkt. No. 278 at

37; *Texas v. Allan Construction Co.* at 1532-33; *See also Pocahontas Supreme Coal Co. Inc. v.

Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987) ("To permit a claim of fraudulent

concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort

of timid inquiry would effectively nullify the statute of limitations in these cases.  It can hardly be

imagined that illegal activities would ever be so gratuitously revealed.  'Fraudulent concealment'

implies conduct more affirmatively directed at deflecting litigation than that alleged here").

(4) Speculative Damages

Limitations are also tolled in circumstances where the injured victim is unable to "prove

with requisite certainty the existence and amount of damages."  *Poster Exchange v. National

Screen Service Corp.*, 517 F.2d at 124; *See also Kaiser Aluminum & Chemical Sales, Inc. v.

Avondale Shipyards, Inc.*, 677 F.2d at 1051 ("the defendant's antitrust act is 'revived' outside the

limitations period, as a basis for damages, because when the act originally occurred, the

plaintiff's damages were speculative or unprovable."); *See also Zenith Radio Corp. v. Hazeltine

Research*, Inc., 401 U.S. at 339-42 (holding that a cause of action does not accrue when damages

are speculative); *See also Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d at 573

discussing *Zenith Radio Corp. v. Hazeltine Research*, Inc., 401 U.S. at 338-42 ("[A] cause of

action for future damages does not accrue until the damages become reasonably ascertainable,

and therefore, capable of proof.").

In Plaintiff's responses to Express Script's interrogatories, Plaintiff answered that its

damages had two components—lost profits and loss of the value of the business.  Dkt. No. 263 at

20; Dkt. No. 266, Ex. N.  Although as noted by the Seventh Circuit in *Brunswick*, "[losses from]

exclusion from a market ... lie mostly in the future," limitations are not tolled in every refusal to

deal case.  *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 271 (7th Cir. 1985)

("[U]nless special circumstances preclude, as excessively speculative, an award of damages

based on predicted as distinct from realized losses due to the defendant's misconduct, the statute

of limitations is not tolled simply in order to wait and see just how well the defendant does in the

market from which he excluded the plaintiff.")[15].

Defendants argue that the damages were not speculative prior to the limitations period

since lost profits and loss of value of business are routinely estimated—Rx.com regularly made

forecasts of its own revenue, expense, and profit estimates and the FTC Letter shows that

Rx.com had enough information to state that "2/3 of the requests from out prospective customers

have to be turned away because certain PBMs refuse to allow Rx.com into their networks."  Dkt.

No. 263 at 20; Dkt.No. 267 at 19; Dkt. No. 270 at 13.

Plaintiff has not, in its briefing nor at the hearing, responded to this issue.  Local Rule

7(d) provides that "[i]n the event a party fails to oppose a motion in the manner prescribed

herein, the court will assume that the party has no opposition."  L.R. CV-7(d).  Thus, the Court

finds that the speculative damages exception does not toll the limitations.

(5) Equitable tolling

"The doctrine of equitable tolling preserves a plaintiff's claims when strict application of

the statute of limitations would be inequitable."  *Larry v. Dretke*, 361 F.3d 890, 896 (5th Cir.

---

[15]Similarly, the Fifth Circuit has held that free market prices are ascertainable by expert testimony, discovery, and competitor prices.  See Kaiser at 1053-54; See also City of El Paso at 523 ("By expert testimony the value of the steel in a freely competitive market could have been established.").

2004) *quoting Davis v. Johnson*, 158 F.3d 806, 810 (5th Cir. 1998).  The doctrine "will be granted in 'rare and exceptional circumstances' and will not be granted if the applicant failed to diligently pursue his rights."  *Larry v. Dretke*, 361 F.3d at 897 *quoting United States v. Patterson*, 211 F.2d 927, 930 (5th Cir. 2000); *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).

Plaintiff claims that equitable tolling should apply in this case since Rx.com lacked any person with the right to investigate or bring any antitrust claims for most of the limitations period since all board members and officers resigned in May 2001 and the receiver appointed from December 2001 to April 2004 had no authority in regard to matters outside the state court case. Dkt. No. 278 at 40; Dkt.No. 280 at 39; Dkt. No. 279 at 40.  Defendants argue that the receiver had the authority and duty to pursue all of the corporation's claims. Dkt. No. 296 at 18-19; Dkt. No. 267 at 20; Dkt. No. 270 at 15.

"A receiver only has the authority conferred by the Court's order appointing him."  *Ex parte Hodges*, 625 S.W.2d 304, 306 (Tex. 1981); *See also In re Lewis*, 223 S.W.3d 756 (Tex. App. 2007) ("A receiver has authority to act only on the property that is tendered to the receiver's care by a court with authority.").  In the unrelated state litigation *of Rosson, et al. v. Rx.com et al.*[16], the Court appointed the receiver for Rx.com and authorized the receiver to "determine whether the current assets, liabilities and condition of Rx.com, Inc. are such that a bankruptcy case should be commenced by Rx.com, Inc."  *See* Dkt. No. 284 at Ex. 105-106.  As Express Scripts argues, the right to file a lawsuit is part of the assets of a bankruptcy estate.  *See* Dkt. No. 291 at 15; *Burnett v. Chase Oil & Gas, Inc.*, 700 S.W.2d 737, 741 (Tex. App. 1985) *citing In re*

---

[16] *Rosson et al. v. Rx.com et al.*, Cause No. GN0–1419 (261st Judicial District Court, Travis County, Texas).

*Mortgageamerica Corp.*, 714 F.2d 1266 (5th Cir. 1983).  Thus, the receiver appointed in *Rosson, et al. v. Rx.com et al.* had both the authority and duty to pursue Rx.com's antitrust claim.  *See Brunett v. Chase Oil & Gas, Inc.*, 700 S.W.2d at 741 ("the corporate receiver has the duty to pursue the corporation's claims against others.  Art. 7.07 B grants the receiver the authority to sue and be sued.  Surely he may not abandon assets because litigation is required to secure them."); *See also Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court, Inc.*, --- S.W.3d ---, 2003 WL 21025030 at *5 (Tex. App. 2003) ("a receiver may bring suits in his or her official capacity without court permission.").  Since the receiver was not precluded from bringing antitrust claims on behalf of Rx.com[17], the Court finds that the limitations are not tolled for the time the receivership was in place, from December 2001 to April 2004.  *See Durish v. Uselton*, 763 F.Supp. 192, 198 *citing Nichols v. Wheeler*, 304 S.W.2d 229, 232 (Tex. Civ. App. 1957) ("Under Texas law the appointment of receiver generally does not affect the running of a statute of limitations."); *Autry v. Dearman*, 933 S.W.2d 182, 191 (Tex. App. 1996).

The Court notes that the period between May 2001 and December 2001, when all board members and officers resigned but before the receiver was appointed, may represent "rare and exceptional circumstances."  *See Larry v. Dretke*, 361 F.3d at 897.  However, having found that Plaintiff's claims accrued in February 2000 at the latest, the Court finds that such tolling would not prevent the lapse of the statute of limitations prior to October 2004, when Plaintiff filed its complaint.

## IV.  CONCLUSION

---

[17] "[T]he statute of limitations may be tolled if the circumstances are such that the appointment of a receiver in effect precludes the bringing of an action."  51 AM. JUR. 2d, *Limitation of Actions*, § 209 (2d ed. 2008).

For all of these reasons, Defendant Caremark's Motion for Summary Judgment (Dkt. No. 263), Defendant Medco's Motion for Summary Judgment (Dkt. No. 267), and Defendant Express Script's Motion for Summary Judgment (Dkt. No. 270) should be **GRANTED**.

**SIGNED this 11th day of March, 2008.**

_____
DAVID FOLSOM
UNITED STATES DISTRICT JUDGE